PEOPLE ex rel. BRENNAN v. BINGHAM, Police Com'r.

(Supreme Court, Appellate Division, First Department.   March 12, 1909.)

1. MUNICIPAL CORPORATIONS (§ 185*) — POLICE OFFICERS — CHARGES — SUFFI-
CIENCY.
   Where the superintendent of the telegraph and electrical service in the
   police department of the city of New York showed a good record for
   many years, and since he became superintendent the electrical equipment
   had enormously increased under his supervision, and the contracts for the
   laying of the wires were on file in the police department, and showed in
   detail the termini and course of each section of wire, and during his in-
   cumbency there had never been an interruption of service in any wire
   which had not been located and repaired within two hours, the failure of
   the superintendent to keep on hand diagrams of the locations of the
   wires and connections was not ground for his dismissal from the service.
   [Ed. Note.—For other cases, see Municipal Corporations, Dec. Dig. §
   185.*]

2. MUNICIPAL CORPORATIONS (§ 185*) — POLICE OFFICERS — CHARGES — SUFFI-
CIENCY.
   Where the superintendent of telegraph and electrical service in the po-
   lice department of the city of New York had a good record for many
   years, and had made rules calling for an accurate record of electrical sup-
   plies as they were used and that he had to rely on subordinates, the in-
   sufficient manner in which the account of electrical supplies was kept did
   not justify his dismissal from the service.
   [Ed. Note.—For other cases, see Municipal Corporations, Dec. Dig. §
   185.*]

3. MUNICIPAL CORPORATIONS (§ 185*) — POLICE OFFICERS — CHARGES — SUFFI-
CIENCY.
   The fact that the superintendent of telegraph and electrical service in
   the police department in the city of New York had technically violated a
   rule of the department by purchasing a mile of telephone wire, instead of
   making a requisition for it on the bureau of supplies, did not justify his
   dismissal from the service, on it appearing that the work for which the
   wire was required was emergency work in pursuance of an order of the
   police commissioner to make immediate telephonic connections with a cer-
   tain point, and to do what was necessary in that regard, and that the
   work was in fact done within 24 hours.
   [Ed. Note.—For other cases, see Municipal Corporations, Dec. Dig. §
   185.*]

4. MUNICIPAL CORPORATIONS (§ 185*) — POLICE OFFICERS — CHARGES — SUFFI-
CIENCY.
   The fact that the superintendent of telegraph and electrical service in
   the police department in the city of New York so exposed the wires lead-
   ing into police headquarters that a maliciously disposed person might
   tamper with them on the headquarters being left unguarded did not jus-
   tify his dismissal, on it appearing that nothing had occurred to the wires
   for 15 years.
   [Ed. Note.—For other cases, see Municipal Corporations, Dec. Dig. §
   185.*]

5. MUNICIPAL CORPORATIONS (§ 185*)—POLICE OFFICERS—DISMISSAL FROM SERV-
ICE—JUDICIAL REVIEW.
   The court on certiorari to review the dismissal of a member of the police
   department of the city of New York will be slow in reversing the action
   of the commissioner based on conflicting evidence on an issue of fact.
   [Ed. Note.—For other cases, see Municipal Corporations, Dec. Dig. §
   185.*]

*For other cases see same topic & § NUMBER in Dec. & Am. Digs. 1907 to date, & Rep'r Indexes

6. MUNICIPAL CORPORATIONS (§ 185*)—POLICE OFFICERS—DISMISSAL FROM SERV-
ICE—CHARGES.

    The charges against a member of the police department of the city of
New York to effect his dismissal must be substantial, and show some dere-
liction or neglect of duty, or something affecting his character and fitness
for the position.

    [Ed. Note.—For other cases, see Municipal Corporations, Dec. Dig. §
185.*]

    Laughlin and McLaughlin, JJ., dissenting.

Certiorari by the People, on the relation of Michael R. Brennan,
against Theodore A. Bingham, police commissioner of the city of
New York, to review the dismissal of the relator from his position
as a member of the police department of the city of New York.
Writ sustained, and dismissal reversed.

Argued before INGRAHAM, McLAUGHLIN, LAUGHLIN,
CLARKE, and SCOTT, JJ.

    Emil Goldmark, for relator.
    Theodore Connoly, for respondent.

SCOTT, J. This is a proceeding by certiorari to review the re-
moval of the relator from the position of superintendent of telegraph
and electrical service in the police department of the city of New
York. The principal charges against the relator were "neglect of
duty, neglect of orders, and violations of rules." Three separate
charges were made, all to the same general effect, and the trial was
had upon all of them.

The principal offense charged in the specifications was that the re-
lator had omitted and neglected to keep or cause to be kept accurate
diagrams of the locations of cables, wires, and connections with ref-
erence to police lines, and had failed to keep or cause to be kept ac-
curate records thereof. The disobedience of orders charges, in ef-
fect, covered the same alleged delinquencies. When the deputy com-
missioner who fathered the charges found by investigation that such
records as he deemed necessary to be kept had not been kept, he
ordered relator to deliver to him the nonexistent records. Of course,
the relator could not comply, and the charge of disobedience of or-
ders is predicated upon this inability. No rule of the department had
required diagrams to be made, no expert evidence was produced
showing any police necessity for such diagrams, and it does not ap-
pear that there had ever been any embarrassment or lack of efficien-
cy arising from the lack of such diagrams. The relator was able
to show an unusual record of efficient service. His employment be-
gan on March 28, 1876, when he was appointed telegraph operator
in the police department of the former city of New York. He was
promoted to chief operator in 1887, was made assistant superintend-
ent in 1889, and in 1893 became superintendent of the telegraph bu-
reau of the police department of the former city of New York.
Upon consolidation on January 1, 1898, he became superintendent
of telegraphs for the greater city, embracing all the boroughs, and

then became a member of the uniformed force. When relator became superintendent in 1893, the electrical equipment of the police department was insignificant. The old dial system was in use; there being only 5 dials and 85 miles of wire. There were no telephones in use, except one or two used experimentally, and no wires under ground. Since relator became superintendent, the electrical equipment has increased enormously under his direction and supervision. There are now 91 precincts and subprecincts, as against 35 in 1893. The mileage of conductors has increased from 85 miles to 2,800, of which more than 2,300 miles have been placed underground. In addition, a signal service has been installed with upwards of 1,200 signal stations, and the working force of the bureau has been increased from 12 to 87 men. All this has been done under the direct and immediate supervision and direction of relator, and no complaint is made of the manner in which the work has been performed, or of its efficiency and present condition.

The relator has, of course, served under many commissioners, all or nearly all of whom testified to his faithfulness and efficiency while they were at the head of the department. It appears that, when relator was made superintendent in 1893, he caused diagrams to be made showing the police wires then in use in the former city of New York. These have been wholly or partly supplanted by underground wires, which are laid in conduits constructed by a corporation authorized to construct conduits for carrying electrical conductors under ground. The contracts with this company are on file in the police department, and show with accuracy and in detail the termini and course of each section of wire laid in such conduits. To make a diagram showing graphically the course of all these wires would be an easy matter from these contracts, but it is not apparent that any particular advantage would result therefrom. It appears in evidence that during relator's superintendence there has never been a break or interruption of service in any wire, either underground or overhead, which has not been located and repaired within two hours. So that, however desirable it may have been theoretically to keep on hand diagrams such as relator is accused of having failed to keep, they have not been shown in the course of 15 years to have been at all necessary to the practical efficiency of the police service.

A further charge against relator was based upon the inefficient manner in which, as was alleged, he kept account of the electrical supplies. Of course, with the vast increase of the electrical equipment, the amount of supplies necessary to be kept on hand to meet emergencies proportionately increased, and equally, of course, the relator himself, with the onerous duties imposed upon him, could not give his personal attention to handing out supplies when needed. In this regard he was obliged to rely upon subordinates. It appeared that he made rules, which, if followed, would have kept an accurate record of such supplies as they were used, and so far as appears such rules were effective, because an attempt to show a shortage failed, and the charge based thereon was found to be not

proven. It was also charged against relator that he had on one occasion bought a mile of telephone wire, instead of making a requisition for it upon the bureau of supplies. This was technically in violation of a rule of the department, but it appeared that the work for which the wire was required was what may justly be termed emergency work, being performed in pursuance of an order of the commissioner to make immediate telephonic connections with a certain point, and to do whatever was necessary in that regard. The work was in fact done within 24 hours.

A further charge was based on the fact that the wires entering the building were not properly guarded. The wires leading from Mulberry street into police headquarters are inclosed in a leaden sheath, which is itself contained in an iron conduit. The conduit passes under the street, under the sidewalk, and issues into a grating covered area 4 feet wide, thence across the area past the outside line of the building wall, and through an archway for 18 inches. The wall of the building is 28 inches thick, for the last 10 inches of which within the wall itself the lead covered cable is not protected by an iron sheath. The conduit passes through the area 4½ feet below the grating. It was also said that the so-called "bridle wires" leading from the conduit in the cellar of police headquarters were not so protected as to render it impossible for a maliciously disposed person to tamper with them. This charge seems to be little short of trivial, when asserted as the justification for the discharge of an old and well-tried employé. It is true that it is conceivable that, if police headquarters were left entirely unguarded, an ingenious and maliciously disposed person might get at the wires and injure them, but it seems quite improbable that such a thing would happen, and, if extreme assurance on this point were desired, it could be effected by a simple order. Nothing had happened for 15 years, and the leaving of matters in this condition falls far short of showing general inefficiency. If there were any question of fact at issue involving the consideration of conflicting testimony, we ought to be, and should, be very slow to reverse the action of the commissioner. There is no conflict, however, as to the facts, and the only question before us is whether upon the established and uncontradicted facts the action of the commissioner can be justified.

General inefficiency in a public officer is a serious defect, and yet one which is often difficult to prove. When it exists, it usually displays itself in a general slackness in the performance of duty. Nothing of that sort was charged or proven against the relator. On the contrary, his general efficiency, as judged by the result of his services, appears to have been of a high order. Indeed, his superiors in the department appear to have found some difficulty in formulating charges upon which the relator might be removed. On November 8, 1907, he was suspended from duty without pay "pending investigation of the bureau of electrical service and the trial of charges against him." For nearly three months no charges were preferred, when he made an application for a mandamus for restoration. This motion was returnable on January 31, 1908. Three days before

that time he was served with the first charge. On February 11th and 24th further charges were prepared and served. He was granted a mandamus ordering his reinstatement, and he was reinstated, but on the same day, and only 20 minutes later, he was again suspended without pay, and so remained until his dismissal. It seems that during the period covered by the first suspension two experts, employed for the purpose, were engaged in scrutinizing the electrical equipment of the department in search of deficiencies which would serve as a basis for charges against the relator. The trial of charges against a member of the police department should be something more than a mere form to cover a predetermined intention to be rid of him. People ex rel. Trayer v. Bingham, 126 App. Div. 350, 110 N. Y. Supp. 414. As was said by this court in People ex rel. Mitchel v. La Grange, 2 App. Div. 444, 37 N. Y. Supp. 991, affirmed 151 N. Y. 664, 46 N. E. 1150:

"It is equally well settled that the cause assigned must be substantial, and not shadowy, and that the explanation must be received and acted upon with good faith, and not arbitrarily. To be substantial, the cause assigned must be some dereliction on the part of the subordinate, or neglect of duty, or something affecting his character and fitness for the position. * * * If it is such an explanation as should satisfy any fair-minded man, if it admits of no reasonable inference of dereliction or incompetency, it cannot be denied its due effect in acquitting the accused and securing his continuance in office."

The language used by this court in People ex rel. Gannon v. McAdoo, 117 App. Div. 438, 102 N. Y. Supp. 656, is equally applicable to the present case:

"It is unquestionably true that the charter (Laws 1901, p. 129, c. 466, § 302) vests the discretion in the police commissioner—where a member of the force has been found guilty of charges preferred against him—of determining the punishment to be inflicted, but the charge must be substantial and fairly sustained by evidence. It cannot be that the Legislature intended when lodging this discretion with the police commissioner that the extreme penalty should be visited upon a police officer, for what at most is a mere technical violation of a rule which is not shown to have prejudiced any right of the department. People ex rel. Devaney v. Green, 89 App. Div. 296, 85 N. Y. Supp. 866. The facts here proved do not establish a conscious violation of any rule or the omission of any duty on the part of the relator, or any intent on his part to deceive his superior officer or any one else, and it cannot be that a conviction of neglect of duty, conduct unbecoming an officer, and violation of the rules of the department can be possibly sustained upon the evidence set out in this record without doing manifest injustice. People ex rel. Reardon v. Partridge, 86 App. Div. 313, 83 N. Y. Supp. 705; People ex rel. Hogan v. French, 119 N. Y. 493, 23 N. E. 1058. Here, as already indicated, this officer had been a member of the police department for upwards of 15 years. His record, so far as appears, is good, and, if appeals to this court are to be anything more than a form, I do not see how it can be said upon this record that the dismissal of the relator can be sustained."

The cases are not unlike, except that the relator in the present case has a much longer record of efficient service, and is charged with even more unsubstantial offenses. The writ should be sustained, the dismissal reversed, and the relator reinstated, with $50 costs and disbursements.

INGRAHAM and CLARKE, JJ., concur. LAUGHLIN and McLAUGHLIN, JJ., dissent.